FILED

2023 Sep-15  AM 09:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **TONYA CARTER,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  4:20-cv-00018-MHH** |
| | } | |
| **KILOLO KIJAKAZI,** | } | |
| **Commissioner of the** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | | |

## <u>MEMORANDUM OPINION</u>

Tonya Carter has asked the Court to review a final adverse decision from the Commissioner of Social Security.  The Commissioner denied Ms. Carter's claims for disability insurance benefits and supplemental security income based on an Administrative Law Judge's finding that Ms. Carter was not disabled.  Ms. Carter argues that, in denying her request for benefits, the Administrative Law Judge—the ALJ—improperly rejected her testimony concerning pain and other symptoms and failed to address a side effect of her medications.  Ms. Carter also argues that substantial evidence does not support the ALJ's residual functional capacity findings.  After careful review, the Court affirms the Commissioner's decision.

## ADMINISTRATIVE PROCEEDINGS

To succeed in her administrative proceedings, Ms. Carter had to prove that she was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if [s]he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[1]

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

---

[1] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited March 8, 2023).

*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).   "The claimant has the burden of proof with respect to the first four steps."   *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009).   "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy."   *Wright*, 327 Fed. Appx. at 137.

In 2016, Ms. Carter applied for a period of disability, disability insurance benefits, and supplemental security income.  (Doc. 9-3, p. 13).  She alleged that her disability began on October 14, 2016.  (Doc. 9-7, p. 6).  The Commissioner initially denied Ms. Carter's claims, and she requested a hearing before an ALJ.  (Doc. 9-6, p. 14).  Ms. Carter attended a hearing before the ALJ on November 14, 2018; her attorney attended the hearing too.  (Doc. 9-4, p. 4).[2]  A vocational expert testified at the hearing.  (Doc. 9-4, pp. 26-31).

The ALJ issued an unfavorable decision on January 4, 2019.  (Doc. 9-3, p. 13-26).  On November 12, 2019, the Appeals Council declined Ms. Carter's request for review, (Doc. 9-3, pp. 2-4), making the Commissioner's decision final and a proper candidate for this Court's judicial review.  See 42 U.S.C. § 405(g).

---

[2] Ms. Carter appeared with her attorney at the hearing location in Gadsden, Alabama for a video conference call with the ALJ, who was located at a hearing office in Oklahoma.  (Doc. 9-4, p. 4).

3

# EVIDENCE IN THE ADMINISTRATIVE RECORD

## *Ms. Carter's Medical Records*

To support her application, Ms. Carter submitted medical records relating to treatment and diagnoses of several medical conditions including high cholesterol, low potassium, mild congestive heart failure, allergies, migraines, GERD, vitamin C deficiency, osteoarthritis, vertigo, fatigue, irritable bowel syndrome, chronic pain syndrome, insomnia, left heel spur, and status post cholecystectomy. Ms. Carter also submitted medical records that relate to the diagnosis and treatment of degenerative disc disease of the back, degenerative joint disease of the hips, right foot degenerative joint disease, COPD, depression, and PTSD. The Court has reviewed Ms. Carter's complete medical history and summarizes the following medical records because they are most relevant to Ms. Carter's arguments in this appeal.

## *Ms. Carter's Medical Records*

On January 11, 2012, Ms. Carter sought treatment at the Riverview Regional Medical Center emergency room for nausea and a severe headache. Dr. Smithson Ahiabuike diagnosed Ms. Carter with accelerated hypertension and admitted her because her blood pressure was 200/115. (Doc. 9-9, pp. 3-4). Dr. Ahiabuike gave Ms. Carter several blood pressure medications including Vasotec, metoprolol, and clonidine. The medicine stabilized her blood pressure. (Doc. 9-9, p. 3).

In 2012, Ms. Carter saw Dr. Oluwole S. Akisanya at First Care Medical Clinic monthly for hypertension, headaches, acute sinusitis, low back pain, osteoarthritis, joint pain, and fatigue. (Doc. 9-14, pp. 11-47). Dr. Akisanya continued Ms. Carter on clonidine and metoprolol to regulate her blood pressure and prescribed Lortab for pain. Ms. Carter's blood pressure was 156/94 at a June 2012 visit and 164/100 at a July 2012 visit. (Doc. 9-14, pp. 21, 26). Dr. Akisanya added a prescription for carvedilol to treat Ms. Carter's high blood pressure. (Doc. 9-14, p. 29). At the July 2012 visit, Ms. Carter reported numbness in her left leg, tingling in her hands, and sharp chest pain. (Doc. 9-14, p. 21). Dr. Akisanaya added a prescription for a muscle relaxer in August 2012; Ms. Carter rated her back and joint pain as "5/10." (Doc. 9-14, pp. 17, 20). Ms. Carter's blood pressure fluctuated from high to normal in 2012. In December 2012, Dr. Akisanya changed Ms. Carter's blood pressure medications to carvedilol and losartan and added Soma to Ms. Carter's Lortab prescription to treat her pain. (Doc. 9-14, p. 11).[3]

On March 16, 2013, Dr. Jimmy Oguntuyo admitted Ms. Carter to Riverview Regional Medical Center for chest and left leg pain. (Doc. 9-10, p. 3). Ms. Carter's nuclear stress test was normal, and a peripheral angiogram showed "peripheral diabetic neuropathy." (Doc. 9-10, p. 5) Dr. Oguntuyo's discharge diagnoses

---

[3] Soma is a brand name for carisoprodol, a skeletal muscle relaxant. *See* https://www.mayoclinic.org/drugs-supplements/carisoprodol-oral-route/description/drg-20071941 (last visisted July 17, 2023).

included "[c]hest pain, acute coronary syndrome, ruled out," "[l]eft leg pain to rule out peripheral arterial disease," hypertension, diabetes mellitus type 2, diabetic neuropathy, high cholesterol, and "mild congestive heart failure."  Ms. Carter's prescriptions at discharge included gabapentin for neuropathy; Lortab and Lorcet for pain; carvedilol for high blood pressure; and fenofibrate and simvastatin for high cholesterol.  (Doc. 9-10, pp. 3-4). [4]

Dr. Oguntuyo admitted Ms. Carter to Riverview Medical Center on June 11, 2013, because Ms. Carter complained of chest pain and syncope "with associated abnormal jerky movement to rule out seizures."  (Doc. 9-11, p. 5).[5]  Her blood pressure ranged from 159/94 to 175/87.  (Doc. 9-11, pp. 6, 11).  Consulting cardiologist Dr. Korn ruled out a cardiac cause for Ms. Carter's chest pain; Ms. Carter's EKG and a March 2013 cardiac catheterization showed normal results. (Doc. 9-11, p. 11).  Consulting neurologist Dr. Mellick found that the "syncope workup all came back to be negative," the EEG showed no seizure activity, and an CT scan of Ms. Carter's brain was normal.  (Doc. 9-11, p. 8).  Ms. Carter's discharge

---

[4]   Lortab and Lorcet combine hydrocodone and acetaminophen to treat pain.  *See* https://www.mayoclinic.org/drugs-supplements/hydrocodone-and-acetaminophen-oral-route/description/drg-20074089 (last visited July 17, 2023).

[5]   Syncope describes "loss of consciousness for a short period of time" and "is usually called fainting or 'passing out.'"  *See* https://www.ninds.nih.gov/health-information/disorders/syncope (last visited July 17, 2023).

medications included potassium chloride and losartan for high blood pressure and metformin for diabetes. (Doc. 9-11, p. 3).

Ms. Carter returned to Dr. Akisanya at First Care Medical Center in November and December 2013 and complained of dizziness, elevated blood pressure, headaches, left leg pain and numbness. Her blood pressure was 125/76 at the November visit and 122/83 at the December visit. (Doc. 9-12, pp. 90, 95).

Ms. Carter returned to Dr. Akisanya on March 18, 2014 and complained of swelling in her legs, persistent low back pain, headache, and dizziness. (Doc. 9-12, p. 80). Ms. Carter's blood pressure was 162/105. The next day, Ms. Carter presented to the Gadsden Regional Medical Center with a "sudden onset of midsternal chest pain" and elevated blood pressure. (Doc. 9-12, p. 3). Dr. Akisanya admitted Ms. Carter to the hospital. While in the hospital, Ms. Carter "develop[ed an] allergic reaction of an unknown cause" that caused "swelling to her tongue" and "difficulty breathing." (Doc. 9-12, pp. 2-3). Her allergic symptoms resolved with Benadryl. Her chest x-ray was normal showing "no active disease." (Doc. 9-12, p. 3). Dr. Korn was consulted again with respect to Ms. Carter's cardiology symptoms; he recommended monitoring Ms. Carter on an outpatient basis and maintaining her medications. (Doc. 9-12, p. 3).

Ms. Carter saw Dr. Akisanya at his office on April 3, 2014. (Doc. 9-12, pp. 75-76). Ms. Carter rated her chest pain as 5/10 and stated that she had moderate

back pain.  Her blood pressure was 132/84.  (Doc. 9-12, p. 75).  At a May 22, 2014 visit, Ms. Carter complained of a headache and back pain but indicated that medications improved her back pain.  Her blood pressure was normal at 118/80.  Ms. Carter's medications list included Norco for pain; amlodipine, carvedilol, and clonidine for high blood pressure; metformin for diabetes; and gabapentin for neuropathy.  (Doc. 9-12, p. 70).[6]

At the May 2014 appointment, Dr. Akisanya ordered an MRI of Ms. Carter's lumbar and cervical spine.  The lumbar MRI showed that Ms. Carter had "[f]oraminal stenosis from L2-L4 due to arthropathy, ligamentum flavum hypertrophy[,]" "subligamentous bulges[,]" and "probable impingement upon the exiting left L4 nerve root."  (Doc. 9-12, pp. 46-47).  The cervical MRI showed "[m]ild cervical disc disease with small disc bulges and mild foraminal narrowing." (Doc. 9-12, pp. 48-49).

During August 21 and September 5, 2014 appointments with Dr. Akisanya, Ms. Carter reported a headache but no dizziness, and she rated her back pain as 5/10. (Doc. 9-12, pp. 53-59).  Ms. Carter returned to Dr. Akisanya on September 25, 2014 and reported that she had been hospitalized the week before for elevated blood pressure and swelling of her tongue and stated that she was "given clonidine and

---

[6] Ms. Carter's prescription list for this visit did not include the Soma prescription from December 2013.

potassium, zofran and dilaudid." (Doc. 9-14, p. 84).[7]  Her blood pressure was 126/82, and she complained of dizziness when she walked and stood up and sat down. (Doc. 9-14, p. 84).

On February 25, 2015, Ms. Carter visited Dr. Thomas Lackey at Coosa Pain and Wellness for pain management. (Doc. 9-13, p. 16). She reported that she had visited the ER the night before and was diagnosed with a virus. (Doc. 9-13, p. 17). Her blood pressure was 110/65. (Doc. 9-13, p. 17). Ms. Carter complained of lower back pain that began "gradually over time." (Doc. 9-13, p. 16). She stated that her pain was worse when she sat too long, stood a long time, and walked. (Doc. 9-13, p. 16). Ms. Carter rated the severity of her pain as a 5/10 and reported that heat, medications, and rest helped her pain. (Doc. 9-13, p. 16). Dr. Lackey's physical examination of Ms. Carter showed no pain or tenderness in her lumbar spine and full flexion and extension of the lumbar spine with no pain. (Doc. 9-13, p. 17). Her medications list included Lortab and Norco for pain; carvedilol, clonidine, and amiodipine for high blood pressure; Soma and Zanaflex for muscle spasms; and Xanax for anxiety. (Doc. 9-13, p. 16). Ms. Carter complained that her the Zanaflex was not working and was causing her tongue to swell; Dr. Lackey changed the prescription to Flexeril. (Doc. 9-13, pp. 16-17).

---

[7]  The Court has not found September 2014 medical records for a hospital stay.

Ms. Carter sought treatment at the Gadsden Regional Medical Center emergency room April 20-21, 2015 for severe pain in her left arm and leg and left side of her neck. (Doc. 9-13, p. 57). Her blood pressure was 169/106. Ms. Carter had no tenderness in her back and normal range of motion. (Doc. 9-13, p. 58). An x-ray of Ms. Carter's spine that showed "mild cervical dis[c] disease at C3-C4, C4-C5, C5-C6, and C6-C7," no fracture or dislocation, and no soft tissue swelling. (Doc. 9-13, p. 55). She was diagnosed with muscle spasms. (Doc. 9-13, p. 59).

Ms. Carter returned to Dr. Lackey at Coosa Pain & Wellness on April 23, 2015 and reported continuous, sharp pain in her leg and lower back. (Doc. 9-13, p. 13). Her blood pressure was 134/101. (Doc. 9-13, p. 14). Ms. Carter stated that her pain became worse when she stood and walked, the severity of her pain was 5/10, medication relieved her pain by 70%, and her functional level was a 5. (Doc. 9-13, p. 13). She reported improvement in her activities on her medications and a good mood. Ms. Carter stated that her "posture of sleep [was] good," but she had insomnia. (Doc. 9-13, pp. 13-14). She said she "took ambien with side effects" and Benadryl caused a "hangover." (Doc. 9-13, p. 14). Dr. Lackey gave Ms. Carter a prescription for Vistaril for sleep and continued her pain medication. (Doc. 9-13, pp. 14-15).

At her May 8, 2015 appointment with Dr. Akisanya, Ms. Carter reported that she had left leg numbness but controlled hypertension and "well-controlled"

diabetes.  (Doc. 9-14, p. 74).  Her blood pressure was 126/80.  (Doc. 9-14, p. 74).

Dr. Akisanya advised Ms. Carter to take her blood pressure daily, and he continued

all of her prescription medication.  (Doc. 9-14, pp. 77-78).

Ms. Carter returned to Dr. Lackey on June 22 and August 18, 2015.  (Doc. 9-

13, pp. 7-12).  Her blood pressure at the June visit was 140/93, and her blood

pressure at the August visit was 173/93.  (Doc. 9-13, pp. 8, 11).  She complained of

pain in her lower back, neck, and left leg.  (Doc. 9-13, pp. 7, 10).  She rated the

severity of her pain at both visits at a 6/10 and indicated that her medications reduced

her pain by 70 to 80%.  (Doc. 9-13, pp. 7, 10).  She denied side effects from her

medications.  (Doc. 9-13, pp. 7, 10).  Vistaril was not helping Ms. Carter with her

sleep, so Dr. Lackey prescribed Restoril and continued Ms. Carter pain medication.

(Doc. 9-13, pp. 11-12).

At her visits with Dr. Akisanya on August 20 and October 1, 2015, Ms. Carter

reported moderate back pain at 5/10 and joint pain that improved with her

medications.  (Doc. 9-14, pp. 64, 69).  Her blood pressure was 128/80 on August 20,

and 118/72 on October 1.  (Doc. 9-14, pp. 64, 69).  Her chief complaint on August

20 was nasal drainage, and her chief complaint on October 1 was pink eye.  (Doc. 9-

14, pp. 64, 67, 69).  Dr. Akisanya continued Ms. Carter on her medications.  (Doc.

9-14, pp. 67, 72).

At her October 14 and December 14, 2015 appointments with Dr. Lackey, Ms. Carter complained of sharp pain in her cervical and lumbar spine. (Docs. 9-13, p. 4; 9-15, p. 19). By the December 2015 visit, Ms. Carter's pain level had decreased to a 5/10, and she reported that her pain medications relieved her pain by 80%. (Doc. 9-15, p. 19). By a February 9, 2016 visit with Dr. Lackey, Ms. Carter reported back pain at a 6/10 and stated that her medications reduced her pain by 70%. At her April 6 and June 13, 2016 visits, she continued to complain of back and left leg pain, reported the severity of her pain at a 5/10, and stated that her medications relieved her pain by 90%. (Doc. 9-15, pp. 10-15). At the June 2016 appointment, Ms. Carter stated that her activities had improved with her medications, and she denied medication side effects. (Doc. 9-15, p. 10).

Ms. Carter was hospitalized on July 7, 2016 for an allergic reaction at work after being stung by an unknown insect. She followed up with Dr. Akisanya on July 11, 2016. (Doc. 9-16, p. 35). Ms. Carter reported that she "still felt dizzy and light headed." (Doc. 9-16, p. 35). Dr. Akisanya prescribed meclizine to treat dizziness. (Doc. 9-16, p. 39). At visits with Dr. Akisanya on July 18 and September 7, 2016, Ms. Carter reported that her hypertension was controlled, but her diabetes was "fluctuating." (Doc. 9-16, pp. 25, 30). Her blood pressure on July 18 was 138/80, and her pressure on September 7 was 127/78. (Doc. 9-16, pp. 25, 30).

On August 8, 2016, Ms. Carter returned to Dr. Lackey for a follow-up appointment.  Ms. Carter complained of sharp back pain on her left side and had restricted range of motion in her cervical spine.  She rated the severity of her pain as a 5/10, indicated that her pain medications relieved her pain by 90%, and reported no medication side effects.  (Doc. 9-15, p. 7).

On October 4, 2016, Ms. Carter visited with Dr. Lackey and complained of "aching, dull, and shooting" low back and neck pain that radiated down her left leg. (Doc. 9-15, p. 4).  Ms. Carter stated that her pain worsened when she looked left, bent over, squatted, or sat too long.  (Doc. 9-15, p. 4).  She reported the severity of her pain as a 6/10 and stated that her medications relieved her pain by 90% with no medication side effects.  (Doc. 9-15, p. 4).  Her blood pressure was elevated at 189/110.  (Doc. 9-15, p. 5).  At the next follow up with Dr. Lackey on November 30, 2016, Ms. Carter stated she had pain in her neck, right arm, back, and legs that she rated in severity at a 7/10.  (Doc. 9-17, p. 42).  She indicated that her pain was relieved 90% by her medications with no side effects and that she was "able to perform activities normally and with decreased pain."  (Doc. 9-17, pp. 42-43).

At appointments with Dr. Akisanya on November 11 and December 16, 2016, Ms. Carter complained of leg swelling and left foot pain that she rated as an 8/10 in severity.  (Doc. 9-16, pp. 13, 19).  She reported that her hypertension and diabetes "fluctuated," but her anxiety was controlled.  (Doc. 9-16, pp. 13, 19).  Dr. Akisanya

performed a trigger point injection of lidocaine in Ms. Carter's left foot to relieve her pain.  (Doc. 9-16, p. 22).

Ms. Carter returned to Dr. Lackey on January 25, 2017 and reported left leg pain and increased "aching pain in right side of [her] neck" that she rated in severity as a 6/10.  (Doc. 9-17, pp. 38-39).  Ms. Carter stated that her medications relieved her pain by 90%.  Dr. Lackey's treatment notes indicated that Ms. Carter could "perform activities normally and with decreased pain."  (Doc. 9-17, p. 39).  At her next visit with Dr. Lackey on March 22, 2017, her pain level remained a 6/10; she stated her medications relieved her pain 80%.  (Doc. 9-17, p. 35).

At her February 9, 2017 appointment with Dr. Akisanya, Ms. Carter complained of joint pain in her hands, feet, and ankles but stated that her medications eased her pain.  (Doc. 9-16, p. 6).  Her blood pressure was 140/90.  Ms. Carter reported that her blood pressure fluctuated but denied dizziness.  She indicated that her blood sugar levels and anxiety were controlled.  (Doc. 9-16, p. 6).  At the April 18, 2017 appointment, Ms. Carter reported that both her hypertension and diabetes fluctuated and rated her joint pain as a 5/10 in severity.  (Doc. 9-19, p. 65).

Between April 27 and May 5, 2017, Ms. Carter sought treatment at the Gadsden Regional Medical Center emergency room on three occasions.  On the April 27 visit, Ms. Carter indicated that she woke up with "moderate" pain in her neck and wrists, swelling in her right wrist, and left side chest pain that "comes and

goes." (Doc. 9-19, p. 7). She reported that she had "no hx of this." (Doc. 9-19, p. 8). Ms. Carter had normal range of motion and normal strength. (Doc. 9-19, p. 9). Ms. Carter returned to the emergency room on May 1 and May 4, 2017 and complained of an allergic reaction, swelling, burning, and dizziness. (Doc. 9-18, pp. 91-100; Doc. 9-19, pp. 2-6) Dr. Akisanya treated Ms. Carter with Benedryl, epinephrine, Zyrtec, and a steroid pack. (Doc. 9-18, pp. 91-100; Doc. 9-19, pp. 2-6)

On May 17, 2017, Ms. Carter told Dr. Lackey at her follow-up visit that she had pain in her back and legs, that her pain increased when she walked and performed her activities of daily living, and that the severity of her pain was a 6/10. (Doc. 9-17, p. 31). She reported to Dr. Lackey that her pain medications relieved her pain by 90% with no side effects and that her activities had improved with her medications. (Doc. 9-17, p. 31). At her May 22, 2017 visit with Dr. Akisanya, Ms. Carter complained of swelling to her tongue and face. (Doc. 9-19, p. 59). She reported that her blood pressure and blood sugar fluctuated, but her medications eased her joint pain. (Doc. 9-19, p. 59).

Ms. Carter returned to Dr. Lackey for a follow-up visit on July 12, 2017. (Doc. 9-17, p. 26). Ms. Carter complained of back, leg, and neck pain that she rated in severity at a 5/10. (Doc. 9-17, p. 26). She stated that her medications reduced her pain by 80%, but her "activities ha[d] decreased after starting [her] medications." (Doc. 9-17, p. 26). Her blood pressure was elevated at 161/119. (Doc. 9-17, p. 27).

15

Nerve conduction tests of Mr. Carter's upper extremities were normal and showed "mild sensory polyneuropathy." (Doc. 9-17, pp. 30, 34). She reported that she had gastritis when she took Flexeril. Dr. Lackey replaced the Flexeril with a prescription for Zanaflex and added a prescription for doxepin for Ms. Carter's insomnia. (Doc. 9-17, pp. 27-28). Ms. Carter's medications also included Norco for pain; Neurontin for neuropathy; Xanax for anxiety; and amlodipine, carvedilol, and clonidine for hypertension. (Doc. 9-17, pp. 26, 28).

Ms. Carter visited the emergency room at Gadsden Regional Medical Center on August 17, 2017 and complained of a "moderate" headache. (Doc. 9-18, p. 73). A CT of her brain was normal. A physical examination showed that Ms. Carter "had normal ROM, normal strength, [and] no tenderness." (Doc. 9-18, pp. 76, 78).

On August 22, 2017, Ms. Carter saw Dr. Sarah Goolsby French at UAB Medicine to establish care. (Doc. 9-20, p. 19). Ms. Carter complained of right foot pain and "ankle swelling in her heel" and rated her pain at a 5/10. (Doc. 9-20, pp. 19, 21). She stated she has "chronic pain in her left leg" that "occurs once a month." (Doc. 9-20, p. 19). An x-ray of Ms. Carter's right foot and ankle showed "some arthritis" and "mildly high" uric acid. (Doc. 9-20, pp. 11, 30). Ms. Carter's blood pressure at this visit was 155/96. (Doc. 9-20, p. 21). Dr. French increased Ms. Carter's prescription for gabapentin to 600 mg twice daily and prescribed coreg in addition to her other medications for her high blood pressure. (Doc. 9-20, p. 23).

16

When she returned to Dr. Lackey on September 13 and November 8, 2017, Ms. Carter indicated that she had sharp, aching pain in her lower back and legs and rated her pain at a 6/10. (Doc. 9-17, pp. 20, 23). She stated that her medications reduced her pain by 60% to 70% with no side effects. (Doc. 9-17, pp. 20, 23).

Ms. Carter returned to Dr. French at UAB Medicine on September 26, 2017. (Doc. 9-20, p. 11). Ms. Carter reported that her medications helped her ankle and foot pain and rated her pain at a 6/10. (Doc. 9-20, pp. 11, 12). Her blood pressure was 154/99, and Dr. French noted that Ms. Carter had "persistently high BP." (Doc. 9-20, p. 11).

On November 28, 2017, Ms. Carter sought treatment for her headaches with neurologist Dr. Robert Pearlman at UAB Medicine. (Doc. 9-19, p. 78). An MRI of Ms. Carter's brain showed "possible idiopathic intracranial hypertension" but otherwise "no acute intracranial abnormalities." (Doc. 9-19, p. 81).[8] Dr. Pearlman's physical examination of Ms. Carter showed "[n]ormal range of motion, [n]ormal strength, and [n]ormal gait." (Doc. 9-19, p. 80). Dr. Pearlman's treatment records showed Ms. Carter's "current medications" included the medications mentioned previously and metformin for her diabetes and nortriptyline for her neuropathy.

---

[8]   Idiopathic intracranial hypertension occurs when "high pressure around the brain causes symptoms like vision changes and headaches" and the cause is unknown. *See* https://www.nei.nih.gov/learn-about-eye-health/eye-conditions-and-diseases/idiopathic-intracranial-hypertension (last visited July 18, 2023).

(Doc. 9-19, p. 79).   Dr. Pearlman stopped the nortriptyline and increased the Neurontin to three times a day.  (Doc. 9-19, p. 80).

On January 3, 2018, Ms. Carter visited Dr. Lackey and reported "sharp and aching" continuous pain in her back and legs.  (Doc. 9-17, p. 16).  She rated the severity of her pain as a 6/10 and indicated her medications relieved her pain by 80% with no side effects.  (Doc. 9-17, p. 16).  Ms. Carter reported that her "pain meds [were] working well," that she was "still active," and that she was "able to perform [her] activities normally and with decreased pain."  (Doc. 9-17, p. 17).  She stated that the doxepin was not helping her insomnia.  (Doc. 9-17, p. 17).

At a February 28, 2018 appointment with Dr. Lackey, Ms. Carter reported the severity of her pain at a 6/10 but stated that she had an overall increase in pain.  (Doc. 9-17, p. 12).  She stated that her medications were not as effective as they had been and that her medications only relieved her pain by 50%.  (Doc. 9-17, pp. 11-12).  Dr. Lackey changed her Norco prescription to Percocet "for a short time."  (Doc. 9-17, p. 12).  At her April 25, 2018 appointment, Ms. Carter indicated the severity of her pain was a 7/10, and medication relieved her pain by 80%.  (Doc. 9-17, p. 7).  Dr. Lackey's notes from that visit indicate that Ms. Carter could "perform [her] activities normally and with decreased pain."  (Doc. 9-17, p. 9).

Ms. Carter returned to Dr. Akisanya on March 15, 2018 and reported leg swelling and "fluctuating" diabetes and hypertension.  (Doc. 9-19, p. 48).  She

visited the emergency room at Gadsden Regional Medical Center on April 6, 2018 and complained of an allergic reaction that caused her tongue to swell.  (Doc. 9-18, p. 20).  Ms. Carter's symptoms resolved after three doses of epinephrine.  (Doc. 9-19, p. 43).

Ms. Carter saw Dr. Akisanya again on April 12, 2018 and reported her emergency room visit the week before.  She complained of joint pain that she rated in severity at a 5/10 and indicated that both her hypertension and diabetes were "fluctuating."  (Doc. 9-19, pp. 42-43).  Ms. Carter also reported that she had fallen and hit her head and described her headache as moderate.  (Doc. 9-19, p. 43).  A CT of Ms. Carter's head showed "no acute intracranial abnormality."  (Doc. 9-18, p. 18). That same day, Ms. Carter saw Dr. Pearlman at UAB Medicine for a follow-up and reported that she was doing "fairly well" on her medications.  (Doc. 9-19, p. 75).

Upon referral by Dr. Akisanya, Ms. Carter visited Dr. William Massey at Alabama Allergy & Asthma Center on May 17, 2018 to address her "tongue swelling, hives, facial swelling, [and] swollen lymph nodes."  (Doc. 9-16, p. 40). Ms. Carter reported "approximately 1 episode of hives and/or angioedema a week." (Doc. 9-16, p. 43).  Dr. Massey instructed Ms. Carter to take two tablets of zyrtec twice a day and follow-up with him in three months.  (Doc. 9-16, p. 43).

At her June 15, 2018 appointment with Dr. Akisanya, Ms. Carter reported moderate shortness of breath and "fluctuating" blood pressure and blood sugar

levels.  (Doc. 9-19, p. 36).  Her blood pressure at this visit was 124/80.  (Doc. 9-19, p. 36).  When she saw Dr. Lackey again on June 18, 2018, Ms. Carter indicated that she had continuous "sharp and aching" pain in her neck, left side, and right hip and rated her pain at a 7/10.  (Doc. 9-17, p. 3).  Ms. Carter stated that her medications relieved her pain by 80% with no side effects.  (Doc. 9-17, p. 3).  Dr. Lackey's physical examination of Ms. Carter showed a decreased range of motion "throughout" but a "firm grip" and no muscle atrophy.  (Doc. 9-17, p. 4).  Dr. Lackey assessed that Ms. Carter could "perform activities normally" on her prescribed medications.  (Doc. 9-17, p. 4).  Ms. Carter reported that the use of "heat, ice, tens, gel and exercising" helped decrease her pain.  (Doc. 9-17, p. 4).  Dr. Lackey's treatment notes indicated that Ms. Carter's medications relieved her back pain. (Doc. 9-17, p. 4).

Ms. Carter sought treatment at the Gadsden Regional Medical Center emergency department on June 26, 2018 for moderate stomach pain, nausea, and shortness of breath.  (Doc. 9-18, p. 3).  Her blood pressure was 172/95.  (Doc. 9-18, p. 5).  A physical examination revealed "[n]ormal ROM [and] normal strength." (Doc. 9-18, p. 6).  An x-ray showed "mild degenerative arthritis of bilateral hips and mild degenerative dis[c] disease in the lower lumbar spine."  (Doc. 9-18, p. 16).  The attending physician, Dr. Michael McBeth, diagnosed Ms. Carter with severe constipation and instructed her to follow up with Dr. Akisanya.  (Doc. 9-18, p. 7).

Ms. Carter returned to Dr. Pearlman at UAB Medicine on July 12, 2018 for a follow-up appointment regarding her headaches.  (Doc. 9-19, p. 72).  Ms. Carter's blood pressure at this visit was 165/103, but she did not complain of "dizziness or lightheadedness."  (Doc. 9-19, p. 72).  Dr. Pearlman's neurological examination of Ms. Carter showed a normal range of motion, normal strength, and a normal gait. (Doc. 9-19, p. 74).   Dr. Pearlman instructed Ms. Carter to follow up with Dr. Akisanya and prescribed 50 mg of Pamelor for Ms. Carter to take at bedtime for her headaches.  (Doc. 9-19, p. 74).[9]  On July 20, 2018, Ms. Carter visited with Dr. French at UAB Medicine for a follow-up appointment.  Her blood pressure was 155/110, and her pain level was a 5/10.  (Doc. 9-20, p. 7-9).

Ms. Carter saw Dr. Akisanya on August 3, 2018 and complained of moderate shortness of breath, lightheadedness, and dizziness when walking.  (Doc. 9-19, p. 30).  Ms. Carter reported that her hypertension and diabetes were "fluctuating" and her blood pressure was 130/80.  (Doc. 9-19, p. 30).  Dr. Akisanya instructed Ms. Carter to "continue phenergan" and "avoid all NSAIDs."  (Doc. 9-19, p. 35).  Ms. Carter's medication list for his visit included, among other medications, an "EpiPen 2-Pak," norco, Xanax, zantac, amlodipine, carvedilol, clonidine, dicyclomine, gabapentin, meclizine, and metformin.  (Doc. 9-19, p. 31).

---

[9]  Pamelor is the brand name for nortriptyine, a "[t]ricyclic antidepressant" used to treat chronic headaches.         *See*              https://www.mayoclinic.org/diseases-conditions/chronic-daily-headaches/diagnosis-treatment/drc-20370897 (last visited July 18, 2023).

On August 17, 2018, Ms. Carter returned to Dr. French at UAB Medicine. Ms. Carter's blood pressure was 128/91, and Dr. French noted that Ms. Carter's blood pressure was better controlled.  (Doc. 9-20, p. 5).  Ms. Carter reported that she had dizziness; Dr. French noted dehydration as the suspected cause.  (Doc. 9-20, p. 5).  Ms. Carter stated that her pain level was 0/10 at this visit.  (Doc. 9-20, p. 5).  Ms. Carter's medications included "amlodipine/Olmesartan [and] Coreg" for her hypertension, metformin and gabapentin for her diabetes and neuropathy, omeprazole for her GERD, Pamelor for her migraines, and Zyrtec for her allergies. (Doc. 9-20, p. 3).

### *Dr. Victoria Hogan's Consultative Physical Residual Functional Capacity Assessment*

On December 15, 2016, at the request of the Social Security Administration, Dr. Hogan reviewed Ms. Carter's medical records and assessed Ms. Carter's physical residual functional capacity.  (Doc. 9-5, pp. 12-14).  Dr. Hogan opined that Ms. Carter occasionally could lift 20 pounds; frequently could lift 10 pounds; and could stand, walk, and sit for "about 6-hours in an 8-hour workday."  (Doc. 9-5, p. 13).  Dr. Hogan stated that Ms. Carter had unlimited ability to push, pull, and balance; occasionally could climb ramps and stairs but never climb ladders, ropes, or scaffolds; frequently could stoop, kneel, crouch, and crawl; and had no manipulative or communicative limitations.  (Doc. 9-5, p. 13).  Dr. Hogan found that Ms. Carter had no environmental limitations but should avoid all exposure to

hazardous machinery and heights.  (Doc. 9-5, pp. 13-14).  Based on these findings, Dr. Hogan opined that Ms. Carter could perform unskilled work at the light exertional level, including jobs as a garment sorter, ticket printer and tagger, and punchboard assembler.  (Doc. 9-5, p. 16).

*Dr. Jack Bentley's Consultative Mental Health Examination*

On January 26, 2017, at the request of the Social Security Administration, Ms. Carter visited psychologist Dr. Bentley.  (Doc. 9-15, p. 86).  Ms. Carter reported that she had "experienced periodic episodes of depression and anxiety much of her adult life."  (Doc. 9-15, p. 86).  She stated that she "never pursued formal psychiatric treatment" and had "never been hospitalized for psychiatric reasons."  (Doc. 9-15, p. 86).  Ms. Carter indicated that she took Xanax as needed.  (Doc. 9-15, p. 86).  Ms. Carter told Dr. Bentley that she left her job at Head Start a year earlier because of "her inability to stand long enough to complete her job description" and because of her fatigue after simple exertion.  (Doc. 9-15, p. 86).  She reported that she could "complete her ADLs without assistance."  (Doc. 9-15, p. 87).

Dr. Bentley diagnosed Ms. Carter with PTSD and "Depressive Disorder due to Medical Health."  (Doc. 9-15, p. 88).  Dr. Bentley opined that Ms. Carter had "moderate limitations in her ability to sustain complex or repetitive work[-]related activities" and mild limitations in her ability to perform simple tasks and communicate effectively with coworkers and supervisors.  (Doc. 9-15, p. 88).  Dr.

Bentley concluded that the prognosis for Ms. Carter's level of functioning was "favorable." (Doc. 9-15, p. 87).

*Dr. Samuel Williams's Consultative Mental Residual Functional Capacity Assessment*

On February 14, 2017, at the request of the Social Security Administration, psychologist Dr. Williams reviewed Ms. Carter's medical records and assessed her mental residual functional capacity. (Doc. 9-5, pp. 14-15). Dr. Williams opined that Ms. Carter had mild limitation in her ability to understand and remember short and simple instructions but moderate limitation in her ability to understand and remember detailed instructions. (Doc. 9-5, p. 15). Dr. Williams found that Ms. Carter had no limitations in her ability to sustain concentration and persistence and socially interact. (Doc. 9-5, p. 15). Dr. Williams opined that Ms. Carter had moderate limitation in her ability to adapt and that her changes in the work setting "should be infrequent and gradually introduced." (Doc. 9-5, p. 15).

*Ms. Carter's Administrative Hearing*

Ms. Carter's administrative hearing took place via "video conference call" on November 14, 2018. (Doc. 9-4, p. 4). Ms. Carter was 51, and she lived with her mother. (Doc. 9-4, p. 7). She testified that she graduated from high school and had earned 18 hours of college credit. (Doc. 9-4, p. 8). She had worked for a temporary agency as a small product assembler, for Inteva Products as a hand packer, for a

youth detention center as a cook, and for Head Start where she rode the bus with the kids, picked them up, and strapped them into their seats.  (Doc. 9-4, pp. 8-14).

Ms. Carter testified that she could not hold a full-time job because her allergic reactions to "something . . . cut[] off [her] breathing," her high blood pressure made her dizzy, her back pain compromised her ability to lift children, and her left side was weak, making it difficult for her to use her left hand.  (Doc. 9-4, p. 14).  She testified that her diabetes was "fairly well[-]controlled."  (Doc. 9-4, p. 22).  She stated that, while she was working, she reached the point where her employer "was having to call the ambulance for [her] at least once every two weeks."  (Doc. 9-4, p. 14).

Ms. Carter explained that her breathing problems affected her ability to clean, and she had to stop and take a break after 15 minutes.  (Doc. 9-4, p. 16).  She testified that dust, fumes, and polluted air affected her breathing.  (Doc. 9-4, p. 16).  She stated that she did not use a rescue inhaler, but she used a nebulizer "three or four mornings a week."  (Doc. 9-4, p. 17).

She stated that her "chronic blood pressure" was uncontrolled, and she had been on "seven different blood pressure pills."  (Doc. 9-4, p. 22).  Ms. Carter testified that her blood pressure elevated while she slept and made her "kind of dizzy and delirious."  (Doc. 9-4, p. 14).  She explained that her elevated blood pressure gave her headaches and hurt her chest.  (Doc. 9-4, p. 23).  Ms. Carter testified that she felt

"out of whack" all the time but felt better after she woke up and took her medication. (Doc. 9-4, p. 23).

Ms. Carter testified that she started "having problems with [her] neck and back" about three years prior to the hearing. (Doc. 9-4, p. 17). Ms. Carter stated that some days, her hands, feet, and leg would "swell so big," that she could not hold a pencil with her left hand, and she could not open a jar that had not already been opened at least once. (Doc. 9-4, pp. 18, 25). She explained that she had burning in her legs and feet from neuropathy "most days." (Doc. 9-4, p. 20). Ms. Carter testified that she had to change positions often, could sit for 30 minutes at a time, but could not sit or stand too long because her back became sore. (Doc. 9-4, p. 20).

Ms. Carter testified that she took Percocet for her back, Flexeril for her "muscles and back," and gabapentin for her "neuropathy on her left side." (Doc. 9-4, p. 18). She rated her "usual back pain" as a "six or seven maybe" that went down to a "one, or two, or three, somewhere in there" when she took her medication. (Doc. 9-4, p. 19). Ms. Carter testified that some of her medications, including her Phenergan, made her "drowsy a lot." (Doc. 9-4, p. 24).

Ms. Carter stated that her "mental issues" bothered her more than when she was younger. She testified that she did not "say a lot about it" because that is what she had done all her life. (Doc. 9-4, p. 21).

Regarding her daily activities, Ms. Carter testified that she cleaned the house and washed dishes because she lived with her mom who made her do chores.  (Doc. 9-4, p. 23).  Ms. Carter stated that she had to take a break after 15 minutes of dusting.  She testified that did not sleep well at night and took naps during the day.  (Doc. 9-4, p. 24).

Bonnie Ward testified as a vocational expert.  (Doc. 9-4, p. 26).  She classified Ms. Carter's past work as a small product assembler as light work but performed at a light to medium exertion level; as a hand packer as light work but performed between a light and medium exertion level; as a child monitor as medium work performed at a medium exertion level; and as a cook as medium work performed at a light exertional level.  (Doc. 9-4, p. 27).

The ALJ asked Ms. Ward to consider the work available to an individual with the same age, education, and work experience as Ms. Carter, who could perform light work with the following limitations:

> occasional climbing of ramps and stairs, no climbing of ladders, ropes, or scaffolds, unlimited balancing, frequent stooping, kneeling, crouching, and crawling.  She should avoid moderate— even moderate exposure to dust, fumes, odors, gasses, and other pulmonary irritants.  She should avoid all exposure to hazards such as open flames, unprotected heights, and dangerous moving machinery.  And she is also limited to unskilled work, which is simple, repetitive, and routine.  Her supervision must be simple, direct, and concrete.  Interpersonal contact with supervisors and co-workers must be incidental to the work performed, such as single work.  She should have only occasional workplace changes, which are gradually introduced.  And she must be

> allowed to alternatively sit and stand every 15-30 minutes through the workday for the purpose of changing positions without leaving the workstation.

(Doc. 9-4, p. 28).  Ms. Ward concluded that an individual with those limitations could perform Ms. Carter's past work as a small product assembler as generally performed, but not as Ms. Carter previously performed that job.  (Doc. 9-4, p. 28). Ms. Ward testified that the number of available jobs for that position would be reduced by half to 45,000 because of the sit and stand limitation.  (Doc. 9-4, p. 29).

In the ALJ's second hypothetical, he asked Ms. Ward to assume all the limitations as in the first hypothetical with the added limitation that the individual would "need frequent, unscheduled work breaks and work absences."  (Doc. 9-4, p. 29).  Ms. Ward testified that limitation would preclude all competitive work.  (Doc. 9-4, p. 29).  Ms. Ward explained that acceptable regular breaks include a "10 to15-minute break in the morning, another one in the afternoon, and then a 30 minute to an hour break for lunch."  (Doc. 9-4, p. 29).  Ms. Ward also testified that in her experience, employers usually would tolerate one absence per month.  (Doc. 9-4, p. 30).

## THE ALJ'S DECISION

The ALJ found that Ms. Carter had not engaged in substantial gainful activity since her application date of October 14, 2016.  (Doc. 9-3, p. 15).  The ALJ determined that Ms. Carter suffered from the severe impairments of "degenerative

disc disease of the back; mild degenerative joint disease of bilateral hips; mild right foot degenerative joint disease; essential hypertension; diabetes; COPD, mild sensory polyneuropathy in her bilateral legs and feet; depression; and PTSD." (Doc. 9-3, p. 15). The ALJ also determined that Ms. Carter had the non-severe impairments of neuropathy, hyperlipidemia, hypokalemia, mild congestive heart failure, allergies, "allergic rhinitis/sinusitis," "headaches/migraines," GERD, vitamin C deficiency, osteoarthritis, vertigo, fatigue, "vision problems/conjunctivitis," abdominal pain, "gastroenteritis/colitis," irritable bowel syndrome, rash, "urticarial/pruritis," chronic pain syndrome, insomnia, left heel spur, and "status post cholecystectomy." (Doc. 9-3, pp. 15-16). Based on a review of the medical evidence, the ALJ concluded that Ms. Carter did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 9-3, p. 16).

Considering Ms. Carter's impairments, the ALJ evaluated Ms. Carter's residual functional capacity. (Doc. 9-3, p. 18). The ALJ determined that Ms. Carter had the RFC to:

> perform light work as defined in 20-CFR 404.1567(b) and 416.967(b) except only occasional climbing of ramps/stairs; no climbing of ladders, ropes or scaffolds; unlimited balancing; frequent stooping, kneeling, crouching and crawling; avoidance of even moderate exposure to dust, fumes, odors, gases, and other pulmonary irritants; avoidance of all exposure to hazards such as open flames, unprotected

heights and dangerous moving machinery; and she is also limited to unskilled work which is simple, repetitive and routine; supervision which is simple, direct, and concrete; interpersonal contact with supervisors and coworkers which is incidental to the work performed, e.g. assembly work; only occasional workplace changes which are gradually introduced; and she must be allowed to alternate sitting and standing every 15-30 minutes throughout the workday for the purpose of changing positions, but without leaving the workstation.

(Doc. 9-3, p. 18).

Based on this RFC and relying on the testimony from the vocational expert, the ALJ concluded that Ms. Carter could perform her past relevant work as a small product assembler as it is generally performed at the light exertional level. (Doc. 9-3, pp. 25-26). Accordingly, the ALJ determined that, following Ms. Carter's October 14, 2016 alleged onset date and as of January 4, 2019, she was not under a disability as defined by the Social Security Act. (Doc. 9-3, p. 26).

## STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether substantial evidence in the record supports the ALJ's findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support

a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In making this evaluation, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ.  *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).  If the ALJ's decision is supported by substantial evidence, the, the district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards.  If the court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision.  *Cornelius v. Sullivan*, 936 F. 2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

### *Application of the Eleventh Circuit Pain Standard*

Ms. Carter argues that the ALJ improperly applied the pain standard and that substantial evidence did not support the ALJ's reasons for discrediting Ms. Carter's subjective symptoms.  (Doc. 12).  The Court disagrees.

The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through h[er] own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r, Soc. Sec. Admin.*, 771 Fed. Appx. 913, 917. (11th Cir. 2019). When relying upon subjective symptoms to establish disability, "the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223); *Chatham v. Comm'r, Soc. Sec. Admin.*, 764 Fed. Appx. 864, 868 (11th Cir. 2019) (citing *Wilson*). If the ALJ does not properly apply the three-part standard, reversal is appropriate. *McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's credible testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223; *see Gombash v. Comm'r, Soc. Sec. Admin.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that he has a disability 'through his own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)).    If an ALJ rejects a claimant's subjective

testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225.  The Commissioner must accept the claimant's testimony, as a matter of law, if the ALJ inadequately discredits the testimony.  *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v. Comm'r, Soc. Sec. Admin.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing *Cannon*).

In evaluating a claimant's symptoms, the provisions of Social Security Regulation 16-3p apply.  SSR 16-3p provides:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2017 WL 5180304, at *4.  Concerning the ALJ's burden when evaluating a claimant's subjective symptoms, SSR 16-3p provides:

> [I]t is not sufficient . . . to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent."  It is also not enough . . .  simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2017 WL 5180304, at *10.

> In evaluating a claimant's reported symptoms, an ALJ must consider:
>
> (i)   [the claimant's] daily activities;
>
> (ii)  [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
>
> (iii) [p]recipitating and aggravating factors;
>
> (iv)  [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
>
> (v)   [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;
>
> (vi)  [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r of SSA*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

The ALJ found that Ms. Carter's severe impairments "could reasonably be expected to cause [her] alleged symptoms" but concluded that the "intensity, persistence and limiting effects of [Ms. Carter's] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (Doc. 9-3, p. 19). In reaching his decision, the ALJ cited medical records from Dr. Akisanya at First Medical Care Clinic, (Doc. 9-3, p. 21); from Dr. Lackey at Coosa Pain &

Wellness, (Doc. 9-3, pp. 19-20); from Dr. French at UAB Medicine, (Doc. 9-3, pp. 22-23); from Dr. Massey at the Alabama Allergy and Asthma Center, (Doc. 9-3, pp. 21-22); and from Ms. Carter's emergency room visits at Gadsden Regional Medical Center, (Doc. 9-3, p. 22). The ALJ described Ms. Carter's testimony at the hearing. (Doc. 9-3, p. 19). Substantial evidence in the record supports the ALJ's findings regarding Ms. Carter's subjective symptoms.

The ALJ noted that Ms. Carter's June 2018 x-ray that showed mild degenerative arthritis in her hips and mild degenerative disc disease in her lower lumbar spine. (Doc. 9-3, p. 23). The ALJ pointed to July 2017 nerve conduction tests that showed mild sensory polyneuropathy. (Doc. 9-3, p. 22). The ALJ considered a June 2014 MRI and November 2016 x-rays of Ms. Carter's lumbar and cervical spine and an August 2017 x-ray of her ankle that revealed some abnormalities in her spine and ankle. (Doc. 9-3, p. 19). The ALJ pointed to Ms. Carter's testimony that her pain level was a "1-3 out of ten" when she took her medication. (Doc. 9-3, p. 19). The ALJ noted that Ms. Carter generally reported to Dr. Lawley that her medications relieved her pain by 80-90% and that she could perform her activities normally on her prescribed medications. (Doc. 9-3, p. 20). In January 2018, Ms. Carter reported to Dr. Lackey that her pain medications worked well and she was "still active." (Doc. 9-17, p. 17). At her August 2018 visit with Dr. French, Ms. Carter reported her pain as a 0/10. (Doc. 9-20, p. 5). Substantial

evidence in the record supports the ALJ's finding that Ms. Carter's reported pain levels do not suggest pain so limiting that her pain would preclude light work.

The ALJ pointed to the "regularly benign findings on [physical] exam" by Ms. Carter's doctors and Ms. Carter's reported normal range of motion, normal reflexes, normal sensory findings, and normal gait. (Doc. 9-3, pp. 21-22). The ALJ explained that although Ms. Carter complained about pain, numbness, and tingling, her doctors' physical examinations "rarely reflected any significant abnormalities." (Doc. 9-3, p. 22). Substantial evidence in the record supports the ALJ's finding that Ms. Carter's physical examinations revealed no significant abnormalities that would prevent her from working at a light exertional level. (*See* Doc. 9-13, p. 58; Doc. 9-18, pp. 6, 76, 78; Doc. 9-19, pp. 9, 74, 80).

The ALJ acknowledged that Ms. Carter "clearly ha[d] a longitudinal history of difficulty controlling her blood pressure" but found no "specific attributable functional limitation associated" with her hypertension. (Doc. 9-3, p. 23). The ALJ stated that his "assessment for light work with postural and environmental limitations as well as the ability to sit and stand adequately addresse[d] [Ms. Carter's] hypertension." (Doc. 9-3, p. 23).

Ms. Carter argues that the ALJ did not consider her testimony at the hearing that some of her medications made her drowsy. (Doc. 12, p. 25). The ALJ did not specifically mention Ms. Carter's testimony regarding this side effect, but the ALJ

36

stated in his decision that he had considered all Ms. Carter's symptoms based on the requirements of 20 C.F.R. § 404.1529 and SSR 16-3p.  (Doc. 9-3, p. 18).  These regulations require the ALJ to consider "[t]he type, dosage, effectiveness, and side effects of any medications" when evaluating a claimant's subjective symptoms.  *See* 20 C.F.R. § 404.1529; SSR 16-3p.  The ALJ's reference to the relevant regulations indicates that he considered Ms. Carter's medication side effects when he evaluated her subjective testimony.  *See Robinson v. Comm'r of Soc. Sec.*, 649 Fed. Appx. 799, 802 (11th Cir. 2016) (finding that the ALJ who did not specifically mention testimony about medication side effects considered the side effects because the ALJ cited regulations that required the ALJ to consider the side effects when evaluating the claimant's subjective testimony).

Although Ms. Carter testified at the hearing that "some" of her medications made her drowsy, she repeatedly reported to doctors that she had no medication side effects.  (*See* Doc. 9-15, pp. 4, 7, 10, 42-43; Doc. 9-17, pp. 3, 20, 23, 31); *see also Robinson v. Comm'r of Soc. Sec.*, 649 Fed. Appx. 799, 802 (11th Cir. 2016) (finding that although the ALJ did not discuss medication side effects, the ALJ "discredited [the claimant's] testimony regarding medication side effects when [the claimant] did not consistently complain of them to doctors").  An ALJ may consider a claimant's failure to report medication side effects to her doctors when evaluating her subjective symptoms.  *Werner v. Comm'r of Soc. Sec.*, 421 Fed. Appx. 935, 938 (11th Cir.

2011) (citing *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990)).  Here, the ALJ did not fail to consider Ms. Carter's medication side effect of drowsiness because the ALJ acknowledged that the regulations required him to consider the side effects and because Ms. Carter did not mention to her doctors that her medications made her drowsy.

The ALJ thoroughly considered the medical evidence in the record and adequately explained his reasons for discounting Ms. Carter's subjective reports of pain.  Because the ALJ properly applied the Eleventh Circuit pain standard, and substantial evidence supports his analysis under this standard, Ms. Carter is not entitled to relief on this issue.

### *Residual Functional Capacity Assessment*

Ms. Carter argues that substantial evidence does not support the ALJ's RFC for light work.  She also argues that the ALJ erred in finding that she could perform her past relevant work as a small product handler.  (Doc. 12, pp. 14-22).  The record does not support these arguments.

A claimant's RFC is the "most [a claimant] can do despite [her] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a)(1).  In assessing a claimant's RFC, an ALJ must "consider the limiting effects of all . . . impairment(s), even those that are not severe."  20 C.F.R. §§ 404.1545(e), 416.945(e).  "The RFC assessment must be based on *all* relevant evidence in the case record" including medical history, reports

of daily activities, medical source statements, and the effects of symptoms, including pain. SSR 96-8p at *5 (italics in SSR 96-8p).

In determining an RFC, an ALJ must consider the claimant's "ability to lift and carry weight, sit, stand, push, pull, walk, etc., as well as the claimant's mental abilities." *Pupo v. Comm'r of Soc. Sec.*, 17 F.4th 1054, 1064 (11th Cir. 2021) (citing 20 C.F.R. § 416.945(b)-(c)). An ALJ must use the RFC to determine the claimant's capability to perform "various designated levels of work (sedentary, light, medium, heavy, or very heavy)." *Pupo*, 17 F.4th at 1064. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

Here, substantial evidence supports the ALJ's RFC work at the light exertional level. As discussed previously, the ALJ considered Ms. Carter's entire medical record and properly assessed her subjective symptoms under the pain standard. The ALJ considered Dr. Hogan's opinion that Ms. Carter could perform light work with no environmental or sit and stand limitations. (Doc. 9-3, p. 24). The ALJ gave Dr. Hogan's opinion partial weight because the opinion did not account for Ms. Carter's COPD, allergic reactions, or Ms. Carter's inability to stand or sit

for long periods of time.  (Doc. 9-3, pp. 24-25).  The ALJ gave "considerable deference" to Ms. Carter's testimony and limited Ms. Carter's RFC to light work with both environmental limitations and a sit and stand option.  (Doc. 9-3, p. 24-25).

The ALJ gave Dr. Bentley's opinion that Ms. Carter had only mild to moderate limitations in her mental functioning "great weight" because Dr. Bentley examined Ms. Carter and specialized in psychology.  (Doc. 9-3, p. 25).  The ALJ found Dr. Williams's opinion that Ms. Carter had no limitations in social functioning not persuasive because he did not personally examine Ms. Carter or review all the evidence presented at the hearing.  (Doc. 9-3, p. 25).  The ALJ accounted for Ms. Carter's mental health limitations and limited Ms. Carter to "work wherein supervision was simple, direct, and concrete and interpersonal contact with supervisors and co-workers [was] incidental to work performed."  (Doc. 9-3, p. 25).

The ALJ thoroughly discussed his RFC findings and incorporated non-exertional limitations and a sit and stand option to accommodate Ms. Carter's mental and physical limitations.  Substantial evidence supports the ALJ's RFC finding that Ms. Carter can perform light work.

To determine whether a claimant retains the RFC to perform past relevant work, an ALJ must determine whether the claimant has the RFC to return to "a past job as actually performed by the claimant."  *Long v. Comm'r of Soc. Sec.*, 749 Fed. Appx. 932, 934 (11th Cir. 2018) (citing SSR 82-61).  If not, an ALJ "will consider

whether the claimant can perform the functional demands and job duties of the occupation as generally required by employers throughout the national economy." *Long*, 749 Fed. Appx. at 934. If a claimant has a nonexertional impairment, such as pain, that "limits a wide range of work at a given level," the ALJ must consult a vocational expert to determine whether a claimant can return to her past relevant work. *Werner*, 421 Fed. Appx. at 939.

Substantial evidence supports the ALJ's finding that Ms. Carter could perform her past work as a small product assembler as generally performed in the national economy. At the hearing, the ALJ asked the vocational expert, Ms. Ward, a hypothetical question that included Ms. Carter's RFC limitations. (Doc. 9-4, p. 28). Based on those limitations, Ms. Ward testified that an individual with Ms. Carter's RFC could not work as a small product assembler as Ms. Carter had performed that job at the medium exertion level, but such an individual could perform the small product assembler job as generally performed in the national economy at the light exertional level, (Doc. 9-4, p. 28). Ms. Ward adjusted the number of small product assembler jobs available in the national economy to account for the sit and stand option. (Doc. 9-4, p. 28).

The ALJ relied on the vocational expert's testimony and other evidence in the record to support that Ms. Carter could return to her past work as a small product assembler as generally performed. Substantial evidence supports this conclusion.

## CONCLUSION

For the reasons discussed above, the Court affirms the Commissioner's decision. The Court will enter a final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this September 15, 2023.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE